UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Lolita Renee Jobe,                                      Case No. 3:20-cv-2639

           Plaintiff,

    v.                                                                  MEMORANDUM OPINION
                                                                          AND ORDER

General Motors, LLC,

           Defendant.

## I.  INTRODUCTION

On November 24, 2020, Plaintiff Lolita Renee Jobe filed a complaint against her employer Defendant General Motors, LLC alleging race and sex discrimination, and retaliation under both federal and state law.  (Doc. No. 1).  On March 18, 2022, GM moved for summary judgment on all claims alleged by Jobe.  (Doc. No. 22).  Jobe opposed the motion, (Doc. No. 24), and GM filed a reply.  (Doc. No. 26).  For the reasons stated below, I grant GM's motion for summary judgment.

## II.  BACKGROUND

### A.  Employment History prior to August 30, 2019

Jobe is an African American female who was hired by GM on June 7, 1999, as a Quality Operator at GM's facility in Athens, Alabama.  (Doc. No. 18-1 at 9).  Over the course of her twenty plus years of employment with GM, Jobe transferred to other GM facilities throughout the United States, (*id.* at 9-10), and on January 1, 2016, Jobe transferred to the Toledo, Ohio plant.  (*Id.* at 10). Jobe testified she was motivated to transfer to Toledo from her previous location in Fort Wayne,

Indiana because her supervisor was hostile and harassing, and she was suing GM over the supervisor's conduct. (*Id.* at 6, 10). This lawsuit was settled shortly after Jobe transferred to Toledo.

After Jobe transferred in January 2016, she was working as Quality Operator, Level 4, on GM's 6-speed assembly line. (*Id.* at 11). A Level 4 Quality Operator works "off the [assembly] line" doing various tasks that assist the assembly line workers. (*Id.* at 14). Jobe testified her supervisor constantly harassed her while she was in this position forcing her to do extra work and come in early. (*Id.* at 12, 14-15). On October 26, 2017, Jobe voluntarily resigned as a Quality Operator, Level 4, so that she could return to the assembly line. (*Id.*). Jobe filed a grievance over the situation, and in March 2018, she transferred to GM's 8-speed assembly line. (*Id.* at 11).

On September 17, 2018, Jobe was involved in a verbal altercation with a co-worker, Yvette Hollis.[1] (*Id.* at 11; Doc. No. 22-1 at 4-5 & 88-93). Hollis reported the incident to their Group Leader Clayton Phillips[2] and it was then passed along to the Human Resources/Labor Relations ("HR/LR") department for investigation. (Doc. No. 22-1 at 88-93). DeRonnie Turner[3] of HR/LR, investigated the incident, including interviews with both parties, and concluded that Jobe had engaged in threatening or intimidating behavior. (*Id.*). Jobe was suspended pursuant to the collective bargaining agreement. (Doc. No. 18-1 at 13-14 & 139). Jobe filed multiple grievances and as a resolution, Jobe was transferred back to the 6-speed assembly line in December 2018. (Doc. No. 18-1 at 11-12, 140-41 & 160).

On August 30, 2019, Jobe reported allegations of discrimination or retaliation through GM's employee hotline and HR/LR Partner Leticia Pickens[4] initiated an investigation. (Doc. No. 22-1 at 3 & 6-10). Jobe's complaint encompassed multiple allegations of wrongdoing which are addressed

---

[1] Yvette Hollis is an African American female. (Doc. No. 18-1 at 14).
[2] Clayton Phillips is Caucasian male. (Doc. No. 18-1 at 14).
[3] DeRonnie Turner is an African American male. (Doc. No. 22 at 8).
[4] Leticia Pickens is a Caucasian female. (Doc. No. 22 at 9).

separately below. Pickens interviewed Jobe and the supervisors implicated by her complaints. (*Id.* at 3-4 & 12-25). On September 13, 2019, Pickens summarized her findings and concluded that none of Jobe's allegations could be substantiated. (*Id.* at 4 & 30-35).

### B. Alleged Discriminatory or Retaliatory Incidents from August 30, 2019 Complaint

#### 1. Medical Pass Request on July 20, 2019

GM has an on-site medical facility to treat employees, but they must first receive a medical pass which permits them to leave their workstation and travel to the medical facility. On July 20, 2019, Jobe experienced chest pains so she requested a medical pass from her supervisor Phillips via text message. (Doc. No. 18-1 at 19; Doc. No. 22-1 at 13). Phillips responded he would "be right there" to provide Jobe with a medical pass, but after 20 minutes, he still had not arrived. (Doc. No. 22-1 at 13). After a further wait, Jobe texted Phillips again to ask if she could walk to medical; Phillips responded "yes." (*Id.*). Jobe then walked to the medical facility on her own. (*Id.*). Jobe testified she had never witnessed anyone else wait so long for a medical pass and that often transportation to the medical facility was provided. (Doc. No. 18-1 at 19). Jobe returned to work later that day and did not lose any pay for the time spent at the medical facility. (*Id.*).

Phillips did not recall this specific instance, (Doc. No. 22-1 at 16; *see also* Doc. No. 19-1 at 5), but he testified he had never denied any employee a medical pass. (Doc. No. 19-1 at 5). He further stated that in the event of an emergency, employees could "hit the call box" in their work area to summon GM's Emergency Response Team. (*Id.* at 6). Phillips stated transportation would be provided by the Emergency Response Team if the employee utilized the call box, but Jobe never did so. (*Id.*).

Pickens concluded that Jobe's claim of discrimination in this instance was unsubstantiated because Phillips had granted her a medical pass. (Doc. No. 22-1 at 31).

3

### 2. Early Dismissal on July 25, 2019

Employees may request to leave work early or to work overtime on an Overtime Equalization Report. (Doc. No. 19-1 at 6-7). Phillips testified that requests to leave early for doctor's appointments are prioritized, so the employee should indicate the request is for an appointment and the specific time they need to leave. (*Id.* at 7). An employee may also indicate a general desire to leave early by indicating "L/E" on the chart. (*Id.*). Jobe believed that requests were prioritized based upon who had the highest amount of accumulated overtime. (Doc. No. 22-1 at 13).

On July 25, 2019, Jobe indicated a desire to leave early by writing "L/E" on the chart. (Doc. No. 19-1 at 22). Jobe did not indicate she had a doctor's appointment or the specific time she needed to leave work, but she stated she had previously informed Phillips that her request was for a doctor's appointment. (*Id.*; *see also* Doc. No. 18-1 at 18-19). When asked about this incident in Pickens' investigation, Phillips stated that he did not skip Jobe, and that he followed the chart and the standard procedure of prioritizing requests with greater specificity. (Doc. No. 22-1 at 16). When asked to review the chart, he stated he would prioritize the employee who noted they had an appointment, and then the employees who had requested to leave by a specific time, and finally anyone who simply listed "L/E". (Doc. No. 19-1 at 7). Jobe was released from work early on July 25, 2019, but she alleges she was not released early enough to make her appointment and thus, had to reschedule. (Doc. No. 18-1 at 19).

Pickens concluded she could not substantiate Jobe's claims of discrimination in this instance. (Doc. No. 22-1 at 31).

### 3. Return to Work on August 21, 2019

On August 6, 2019, Jobe requested personal sick leave through GM's third-party administrator, Sedgwick. (Doc. No. 22-1 at 12 & 32-35). Once an employee requests personal sick

4

leave, Sedgwick automatically designates the employee as inactive in the payroll system. (*Id.* at 12). An employee cannot be reactivated in the payroll system until they are cleared by GM's medical team to return from personal sick leave. (*Id.*). After the employee has been cleared, reactivation within the payroll system may take up to 48 hours. (*Id.*).

Around August 15, 2019, Jobe changed her leave status with Sedgwick from personal sick leave to FMLA leave. (*Id.* at 12 & 33). This change in her leave status was not communicated to GM's HR/LR department until on or after August 21, 2019. (*Id.* at 12-13 & 32-33).

When Jobe returned to work on August 21, 2019, she was unable to swipe her time card because it had been deactivated in the payroll system. (Doc. No. 18-1 at 20). Jobe reported the issue with her badge to her new Group Leader Michael Tucker,[5] who advised her to visit medical or HR/LR to clear up the issue since he was unable to reactivate her in the payroll system. (Doc. No. 22-1 at 18 & 25; *see also* Doc. No. 20-1 at 6). Over the next few days, Tucker attempted to input Jobe's hours but found she still was not activated in the payroll system. (Doc. No. 20-1 at 6; *see also* Doc. No. 22-1 at 25). Tucker repeatedly advised Jobe to visit medical or HR/LR to resolve the issue and warned her that she would not timely receive a paycheck until she took care of the issue. (Doc. No. 20-1 at 6; *see also* Doc. No. 22-1 at 25). Jobe reassured Tucker she would take care of it. (Doc. No. 20-1 at 6).

Jobe did not believe that she had to be cleared by medical since she was on FMLA and believed Tucker could resolve the issue himself. (Doc. No. 18-1 at 20). Jobe finally reported to medical on August 26, 2019, and was reactivated in the payroll system. (Doc. No. 22-1 at 12). Jobe received her paycheck two weeks late. (Doc. No. 18-1 at 20).

---

[5] Michael Tucker is an African American male. (Doc. No. 18-1 at 15). Tucker was not Jobe's supervisor at the time she began her leave and he first met Jobe upon her return to work on August 21, 2019. (Doc. No. 20-1 at 5).

Pickens concluded that Jobe was responsible for the delay in receiving her paycheck because she did not timely follow Tucker's instructions to visit medical or HR/LR to resolve the issue. (Doc. No. 22-1 at 30).

### 4. Level 4 Training

Promotion to Quality Operator, Level 4 requires the employee to complete additional training and is also accompanied by a pay increase. (Doc. No. 19-1 at 9-10). Each department has its own training and requirements for Level 4. (*Id.* at 10).

Jobe reported that Phillips stopped her Level 4 training in October 2018 after she was suspended because of the Hollis incident. (Doc. No. 22-1 at 13; *see also* Doc. No. 18-1 at 14). Jobe testified she was replaced in the training by an unidentified white male. (Doc. No. 18-1 at 18). She and Phillips never discussed why she was removed from the Level 4 training. (*Id.* at 14). Jobe further stated she requested Level 4 training on multiple occasions after this from Phillips and other supervisors including Tucker, Brett Rogers, and Janell Tyus. (*Id.* at 15; Doc. No. 22-1 at 13).

Phillips did not recall stopping Jobe's Level 4 training in October 2018, but he did recall that she did not complete the training. (Doc. No. 22-1 at 16; *see also* Doc. No. 19-1 at 10). He later testified it would be typical practice to replace an employee who did not complete Level 4 training with another employee who was interested. (Doc. No. 19-1 at 10). Phillips did not recall Jobe ever asking to resume her Level 4 training. (*Id.*).

Tucker affirmed that Jobe had mentioned Level 4 training to him, but he explained he was unable to offer it to her due to staffing needs. (Doc. No. 22-1 at 18). At that time, no one else on Jobe's team was involved in Level 4 training. (*Id.*). Tucker also testified that he had offered Jobe Level 4 training on a couple other occasions, but she did not agree to it because she would have to consistently train outside of her normal workday and her schedule would not allow that. (Doc. No. 20-1 at 4-5).

6

Brett Rogers and Janell Tyus both denied that Jobe had requested Level 4 training from them. (Doc. No. 22-1 at 22-23).

Pickens concluded that Jobe had not been denied Level 4 training and her claims of discrimination or retaliation were not substantiated. (Doc. No. 22-1 at 30-31).

### 5. Harassment by Management

Jobe's August 30, 2019, complaint also included allegations of offensive comments and harassment by Rogers, Jeremy Spohn, and Ryan Sell. (Doc. No. 22-1 at 14). Jobe complained that these individuals were constantly watching her and scrutinizing her work which caused her to have mental health issues. (*Id.*; *see also* Doc. No. 18-1 at 26).

Rogers allegedly "r[an] behind" her while she worked and constantly watched her. (Doc. No. 18-1 at 34; *see also* Doc. No. 22-1 at 14). Rogers denied both these allegations. (Doc. No. 22-1 at 22). He explained that in his role he was often on the factory floor, but he was not chasing or watching Jobe. (*Id.*).

Allegedly, Spohn and Sell would frequently stare at her while she was on the factory floor or in the break room. (*Id.* at 26). Jobe testified that Spohn had called her a "slut", a "bitch", and stated she "walked like a horse". (*Id.*). In his interview with Pickens, Spohn denied ever making comments about Jobe and further denied that he was watching her while she worked. (Doc. No. 22-1 at 21). Similarly, Sell denied purposefully watching Jobe, stating that at the time "I did not even know who she was and had never even talked to her." (Doc. No. 22-1 at 20).

Since Jobe could offer no corroborating witnesses and each of the involved parties denied Jobe's allegations, Pickens could not substantiate Jobe's claims. (Doc. No. 22-1 at 30).

### C. Subsequent Employment History

On September 10, 2019, Jobe arrived late for work. (Doc. No. 18-1 at 21). Jobe testified that she arrived at 5:30 a.m., clocked in, waited one minute, clocked out at 5:31 a.m., and then went

7

to park her car in the employee parking lot. (*Id.*). After parking, she clocked in again and while on her way to her workstation, she stopped to speak with a co-worker. (*Id.*). Jobe alleged Tucker saw her chatting and then screamed at her for not attending their team meeting at 5:30 a.m. (*Id.*). At the disciplinary interview over this event, Jobe admitted that she did not attend the team meeting but claimed she was present when the line started. (Doc. No. 20-1 at 26).

Her supervisor, Tucker, had a different recollection of the events. Tucker stated Jobe had clocked in at 5:29 a.m., clocked out at 5:31 a.m., and clocked back in at 5:35 a.m. (*Id.*). After Tucker had completed the team meeting and gotten the line started with temporary coverage for Jobe, he began looking for Jobe as she was not present at her workstation. (Doc. No. 20-1 at 7-8). Around 5:50 a.m., Tucker discovered Jobe chatting with a co-worker and not at her workstation. (*Id.* at 7-8 & 26-27).

On September 13, 2019, after holding an interview with Jobe and her union representative, Tucker issued a Notice of Disciplinary Action for Jobe's failure to attend the team meeting and failure to be at the line on time. (Doc. No. 18-1 at 146; *see also* Doc. No. 20-1 at 26-27). Jobe was suspended pursuant to the collective bargaining agreement. (Doc. No. 18-1 at 146).

Jobe alleged this discipline was retaliation for her reporting her claims of discrimination and harassment to GM's hotline in August 2019. (Doc. No. 18-1 at 147). Soon after in October 2019, Jobe filed a joint charge with the Equal Employment Opportunity Commission ("EEOC") and the Ohio Civil Rights Commission ("OCRC") alleging race and sex discrimination, and retaliation. (Doc. No. 1 at 6). The OCRC could not substantiate Jobe's claims and Jobe was issued a "Right to Sue" letter on September 21, 2020, by the EEOC. (Doc. No. 1-1).

In March 2020, Jobe raised another complaint to HR/LR of harassment and retaliation by Spohn, Sell, and others in management, resulting in a hostile work environment. (Doc. No. 22-1 at 115-16). Jobe's allegations were similar to those made in August 2019, alleging Spohn and Sell were

8

constantly watching her while she was on duty trying to bully or intimidate her. (*Id.*). HR/LR Partner Liz Bezerko investigated her complaint but was unable to substantiate her claims. (*Id.* at 94-116).[6]

Jobe alleged this discrimination and retaliation resulted in mental health issues that have required her to be absent from work and have otherwise harmed her. (Doc. No. 1 at 11). Jobe remains employed by GM. (Doc. No. 22 at 14).

### III. STANDARD

"In considering a motion for summary judgment, the Court must view the facts and draw all reasonable inferences therefrom in a light most favorable to the nonmoving party." *Williams v. Belknap*, 154 F. Supp. 2d 1069, 1071 (E.D. Mich. 2001) (citing *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987)).

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial responsibility of "informing the district court of the basis for its motion, and identifying those portions of 'the [record] . . . ,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant may meet this burden by demonstrating the absence of evidence supporting one or more essential elements of the non-movant's claim. *Id.* at 323-25.

Once the movant meets this burden, the opposing party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56(e)). It is not sufficient "simply [to] show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S.

---

[6] The allegations supporting Jobe's second complaint to HR/LR were not included in this lawsuit. (*See* Doc. No. 1).

9

574, 586 (1986). Rather, Rule 56(e) "requires the nonmoving party to go beyond the pleadings" and present some type of evidentiary material in support of its position. *Celotex*, 477 U.S. at 324; *see also Harris v. Gen. Motors Corp.*, 201 F.3d 800, 802 (6th Cir. 2000). Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

## IV. ANALYSIS

Jobe asserts her claims for relief based on indirect evidence. Thus, I will analyze her claims under the *McDonnell Douglas* burden-shifting framework. *Upshaw v. Ford Motor Co.*, 576 F.3d 576, 584 (6th Cir. 2009). Under *McDonnell Douglas*, the plaintiff first must establish a prima facie case. *Id.* If the plaintiff can do so, the burden shifts to the defendant to put forth a legitimate, non-discriminatory reason for its decision. *Id.* If the defendant provides such a reason, then the plaintiff must demonstrate the proffered reason was pretext. *Id.*

### A. Race and Sex Discrimination (Counts One and Four)

Jobe asserts claims for race and sex discrimination under both federal and state law. (*See* Doc. No. 1). Courts in the Sixth Circuit analyze state law claims for discrimination under the same standard as federal claims. *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992); *see also Plumbers & Steamfitters Joint Apprenticeship Comm'n v. Ohio Civil Rights Comm'n*, 421 N.E.2d 128, 131-32 (Ohio 1981) (applying Title VII case law to violations of Ohio's discrimination statute).

A prima facie case of race or sex discrimination requires a plaintiff to show she: (1) is a member of protected class; (2) was qualified for the position; (3) was subject to an adverse employment action; and (4) similarly situated non-protected employees were treated more favorably. *Jackson v. VHS Detroit Receiving Hosp., Inc.,* 814 F.3d 769, 776 (6th Cir. 2016) (citation omitted).

GM argues that aside from the discipline issued on September 13, 2019, none of Jobe's allegations represent adverse employment actions. And even if she had satisfied this element, GM contends Jobe has not identified a similarly situated non-protected employee who was treated more favorably. (Doc. No. 22 at 20-22).

An adverse employment action "'constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Stewart v. Esper*, 815 F. App'x 8, 16 (6th Cir. 2020) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)). "But not every act affecting an individual's employment constitutes a materially adverse change … And de minimis employment actions are not materially adverse." *Stewart*, 815 F. App'x at 17 (internal citations omitted).

Two of Jobe's allegations – denial of a medical pass and denial of request to leave early – are refuted by her own admissions. The record demonstrates that Jobe was granted a medical pass and permitted to leave work early. (Doc. No. 18-1 at 19 & Doc. No. 22-1 at 13-14). Neither of these instances adversely affected Jobe's employment. (*See* Doc. No. 18-1 at 19) (Q: Did you lose any pay for [the medical pass incident]? A: No). At most, these allegations represent "de minimis employment actions," and do not satisfy the adverse employment action prong of Jobe's prima facie case. *Stewart*, 815 F. App'x at 17.

Additionally, and in order to establish a prima facie case, Jobe must demonstrate that a similarly situated non-protected employee was treated more favorably. While Jobe argues that Phillips allowed two white employees to leave earlier than her on that day, the record demonstrates that these employees followed the procedure for requesting off early, but Jobe did not. (*See* Doc. No. 19-1 at 6-7, 22).

Jobe bears the burden of identifying a comparator that "*engaged in the same conduct without such differentiating or mitigating circumstances* that would distinguish … [the] employer's treatment of them [

11

]." *Mitchell*, 964 F.2d at 583 (emphasis added).  Phillips testified that requests to leave early are prioritized by those who request to leave for appointments or to leave at a specific time.  (Doc. No. 19-1 at 7).  An employee may also indicate a general desire to leave early by indicating "L/E" on the chart.  (*Id.*).  A review of the Overtime Equalization Report demonstrates that Jobe only put "L/E" while the other employees noted the specific time they needed to leave by.  (*Id.* at 22).  Thus, there is no genuine dispute that any failure to be let out early enough was the result of Jobe's own failure to follow the procedure and she is not similarly situated with those employees who complied with the procedure.

Next, aside from Jobe's testimony, the record evidence does not support her claim that she was denied Level 4 training at any time.  (*See* Doc. No. 19-1 at 10; Doc. No. 20-1 at 4-5; Doc. No. 22-1 at 22-23).  In fact, Jobe's supervisor Tucker testified that Jobe refused his offer for Level 4 training on more than one occasion.  (Doc. No. 20-1 at 4-5).  But even accepting Jobe's version of the events, she has not identified a similarly situated non-protected employee who was given the training aside from a vague allegation that it was given to a "white guy" in 2018.  (Doc. No. 24 at 12; *see also* Doc. No. 18-1 at 18).

Jobe did not name this employee or establish that they "dealt with the same supervisor, have been subject to the same standards and *engaged in the same conduct without such differentiating or mitigating circumstances* that would distinguish…[the] employer's treatment of them [ ]." *Mitchell*, 964 F.2d at 583 (emphasis added).  It is important to note that according to Jobe, her Level 4 training was stopped because of her suspension related to the Hollis incident in 2018.  (Doc. No. 18-1 at 18).  A disciplinary suspension would certainly be a differentiating circumstance that distinguished GM's alleged treatment of the two employees, but Jobe makes no effort to establish that "in all relevant aspects [her] employment situation w[as] nearly identical" to her alleged unidentified comparator. *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998) (internal quotation marks

12

omitted). It is Jobe's burden to establish the elements of her prima facie case and she has not done so with respect to this allegation.

Moving on to management's alleged scrutiny of Jobe, she has not put forth any argument or legal support to establish that such actions were adverse to her employment. *See Johnson v. United Parcel Servs.,* 117 F. App'x 444, 451 (6th Cir. 2004) ("Regarding the alleged problem of close supervision, the allegation does not meet the definition of an adverse employment action."). Even if Jobe had satisfied this prima facie element, she has not identified any similarly situated non-protected employee who was treated more favorably than her. (*See* Doc. No. 24 at 11-13). Jobe fails to establish a prima facie claim for this allegation.

Finally, there is no question that the disciplinary suspension Jobe received on September 13, 2019, was an adverse action. But Jobe has not satisfied her burden of establishing that similarly situated non-protected employees were treated more favorably than her. Jobe testified that white employees were not disciplined for this same conduct, but she was not able to identify any similarly situated comparators. (Doc. No. 18-1 at 21-22). For example, Jobe claimed women named Julie and Kim were not disciplined for being late. (*Id.*). But Jobe puts forth no evidence, either testimonial or documentary, that would establish these women were similarly situated "in all relevant aspects" to Jobe. *Ercegovich*, 154 F.3d at 352; (*see also* Doc. No. 24 at 11-13).

Jobe does not establish that these women were in a non-protected category, the timeframe when these women were not disciplined, who their supervisor was at the time of the incident, or that either of these women were in fact not disciplined for their conduct. (*See* Doc. No. 18-1 at 22) (Q: Have you seen [Julie's] personnel file and know if she's been disciplined or not? A: No). Such allegations, without support, are insufficient to establish her prima facie burden. What is supported by the evidence is that Jobe admitted to being late in violation of GM's rules, and that her African

13

American supervisor disciplined her for the infraction. (Doc. No. 18-1 at 21; Doc. No. 20-1 at 7; Doc. No. 22-1 at 85).

For the reasons stated above, Jobe has failed to satisfy her burden to demonstrate the elements of a prima facie case of discrimination under federal or state law.

### B. Hostile Work Environment

Jobe does not specifically make a claim for hostile work environment in her complaint. (*See* Doc. No. 1). But taking her allegations of staring and verbal harassment by managers Spohn and Sell in a light most favorable to her, such allegations may support a claim for sex-based hostile work environment.

To establish a prima facie case of hostile work environment, Jobe must show: (1) she is a member of a protected class; (2) she was subjected to unwelcome harassment; (3) the harassment was based on her sex; (4) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment; and (5) the employer knew or should have known about the harassment and failed to act. *Stewart*, 815 F. App'x at 20. To evaluate a hostile work environment claim, courts "'look to all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Id.* (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002)).

In support of her argument of hostile work environment, Jobe relies solely on her own testimony. (Doc. No. 24 at 13); *see Johnson v. Buddy's Bar-B-Q*, No. 1:13-cv-254, 2015 WL 1954454, at *5 (E.D. Tenn. April 29, 2015) ("The Court views self-serving testimony opposing a motion for summary judgment with scrutiny when it is unsupported by additional evidence."). Jobe complained that Spohn and Sell constantly watched her while she is at work. (Doc. No. 18-1 at 26-27). Jobe also recalled incidents where Spohn allegedly called her a "slut" and stated she "walked like a horse."

14

(*Id.*). Jobe testified in one instance both Spohn and Sell allegedly stated "we are going to get you bitch" after she had reported them. (*Id.* at 27). GM investigated these incidents on two separate occasions and was unable to corroborate Jobe's accounts. (Doc. No. 22-1 at 30-31, 97-98, 107-08, 115-16).

But even taking the evidence in a light most favorable to Jobe, she has failed to carry her burden of establishing a prima facie case. Jobe has not cited any evidence that would demonstrate the alleged conduct was based on her sex. The comments themselves, though they have sexual connotations, are not enough to demonstrate that the alleged wrongful conduct was based on Jobe's sex. *See Oncale v. Sundowner Offshore Servs.,* 523 U.S. 75, 80 (1998) ("We have never held that workplace harassment . . . is automatically discrimination because of sex merely because the words used have sexual content or connotations."); *see also Thompson v. Wilkie*, No. 1:18CV1777, 2021 WL 5017400, at *22 (N.D. Ohio Aug. 31, 2021) (stating "it is important to distinguish between harassment and discriminatory harassment, because Title VII prohibits only the latter.").

Also, these comments were not particularly severe or pervasive. Rather they are more akin to "the ordinary tribulations of the workplace." *Faragher v. City of Boca Raton*, 524 U.S. 775, 778 (1998); *see id.* (holding "sporadic use of abusive language, gender-related jokes, and occasional teasing" were not sufficient to support a hostile work environment claim). These comments were not "physically threatening or humiliating" but instead resemble "mere offensive utterance[s]." *Morgan*, 536 U.S. at 116; *Grace v. USCAR,* 521 F.3d 655, 679 (6th Cir. 2008) (holding "occasional comments, which may have been 'offensive utterances,' do not rise to the level required by the Supreme Court's definition of a hostile work environment"). "Title VII does not create a 'general civility code' and sporadic abusive language or offensive comments are not sufficient to support a claim." *Stewart*, 815 F. App'x at 21 (quoting *Faragher*, 524 U.S. at 788).

15

Jobe recalled only three specific instances of allegedly offensive comments over a period of employment representing four years. These isolated incidents do not demonstrate the necessary frequency to support a hostile work environment claim. *See, e.g., Gebers v. Com. Data Ctr. Inc.,* 47 F.3d 1168, at *3 (6th Cir. 1995) (unpublished table decision) (concluding "the single incident of [defendant] calling plaintiff or another female a slut on one occasion is insufficient evidence from which a jury might infer the existence of a sexually hostile work environment."); *Burnett v. Tyco Corp.,* 203 F.3d 980, 985 (6th Cir. 2000) (holding that "under the totality of the circumstances, a single battery coupled with two merely offensive remarks over a six-month period does not create an issue of material fact . . ."); *Williams v. CSX Transp. Co.,* 643 F.3d 502, 513 (6th Cir. 2011) (concluding derogatory comments made mainly over a two-day period were not pervasive and would not support hostile work environment claim).

Even considering these comments along with Jobe's reports of staring, the allegations are insufficient to overcome the "high bar" necessary to demonstrate severe and pervasive conduct. *Phillips v. UAW Int'l*, 854 F.3d 323, 328 (6th Cir. 2017). Jobe's reports that Spohn and Sell were watching her or following her are mitigated by both Spohn and Sell being supervisors whose job it was to be present on the factory floor or to watch the conduct of their employees. *Mast v. IMCO Recycling of Ohio, Inc.,* 58 F. App'x 116, 123 (6th Cir. 2003); *see id.* ("Staring at someone, without more, is not generally sufficient to create a hostile work environment."); *see also Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1250 (11th Cir. 1999) ("Given normal office interaction among employees, the following and staring in the manner described by Mendoza are not the type of conduct that can render Mendoza's claim actionable, even with evidence that the following and staring were 'constant' and thus 'frequent'. . . .").

Accordingly, I find that Jobe has failed to carry her burden in establishing a prima facie case of sex-based hostile work environment.

### C. Retaliation (Counts Two, Three, and Four)

Jobe asserts claims of retaliation under both federal[7] and state law. "The prima facie case for retaliation under [Title VII and the FMLA] is practically identical." *Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400, 419 (6th Cir. 2021). Further, "[b]ecause of these statutes' similar language and origin, Ohio courts have held that 'federal law provides the applicable analysis for reviewing retaliation claims' brought under Ohio Rev. Code § 4112.02(I)." *Braun v. Ultimate Jetcharters, LLC,* 828 F.3d 501, 510 (6th Cir. 2016) (quoting *Baker v. Buschman Co.*, 713 N.E.2d 487, 491 (Ohio Ct. App. 1998)).

Establishing a prima facie case requires the plaintiff to show: (1) she engaged in a protected activity; (2) the protected activity was known to the defendant; (3) the defendant took adverse action against the plaintiff; and (4) there was a causal connection between the protected activity and the adverse employment action. *Wyatt,* 999 F.3d at 419.

Jobe asserts that she was retaliated against because she filed a discrimination lawsuit[8] against her former supervisor at GM before she transferred to the Toledo plant. (Doc. No. 24 at 15) ("Plaintiff filed an EEOC complaint and lawsuit against [GM] immediately before her transfer to Toledo."). But Jobe has not established with evidence, as is her burden, that any of the supervisors who took the alleged adverse actions against her, *i.e.*, Phillips or Tucker, were aware of this lawsuit at any time prior to their actions. *See, e.g., Evans v. Professional Transp., Inc.*, 614 F. App'x 297, 300 (6th Cir. 2015) (holding plaintiffs cannot satisfy second element of prima facie case by showing "general

---

[7] At Count Two, Jobe asserts a claim for retaliation under 29 U.S.C. § 623(d), which prohibits retaliation for complaints regarding age discrimination. (*See* Doc. No. 1 at 8). Jobe makes no allegations with regard to age discrimination in either her complaint or the underlying administrative complaints to GM or the EEOC. (*See* Doc. No. 1.; *see also* Doc. No. 18-1 at 92 & Doc. No. 22-1 at 6-10). I assume this citation was in error and she intended to assert retaliation under Title VII, 42 U.S.C. § 2000e-3(a).

[8] Jobe testified the lawsuit was filed sometime in 2014-15 and though her testimony is unclear, it appears she settled this lawsuit with GM sometime in 2016 after she began work at the Toledo plant. (Doc. No. 18-1 at 6-7).

17

corporate knowledge," rather they must show that the decisionmaker knew of their protected activity); *Mulhall v. Ashcroft*, 287 F.3d 543, 552-54 (6th Cir. 2002) (holding plaintiff had to provide direct or circumstantial evidence that the supervisors who took the adverse action against the plaintiff knew about the protected activity prior to taking that action).

Furthermore, she has failed to demonstrate a causal connection between her lawsuit in 2015 and the alleged retaliation undertaken by Phillips and Tucker in 2018 and 2019. To establish a causal connection, Jobe "must produce sufficient evidence from which one could draw an inference that the employer would not have taken the adverse action against the plaintiff had the plaintiff not engaged in activity that Title VII protects." *Taylor v. Geithner*, 703 F.3d 328, 339 (6th Cir. 2013) (quoting *Abbott v. Crown Motor Co., Inc.*, 348 F.3d 537, 543 (6th Cir. 2003)); *see also Nguyen v. City of Cleveland,* 229 F.3d 559, 563 (6th Cir. 2003) (finding causation may be shown by factors such as close temporal proximity or differential treatment of similarly situated comparators). Jobe cites to no evidence to support her conclusory statement that her prior lawsuit was "clearly the cause" of her 2018 discipline involving the verbal altercation with Hollis, rather than her own behavior. (Doc. No. 24 at 15; Doc. No. 18-1 at 157; Doc. No. 22-1 at 89-93)

Nor can Jobe rely on temporal proximity alone to infer causation as approximately three years had passed between the filing of her lawsuit and the alleged first instance of retaliation by Phillips in 2018, and even more time between that and any alleged retaliation by Tucker. *See, e.g., Kenney v. Aspen Techs., Inc.*, 965 F.3d 443, 449 (6th Cir. 2020) (concluding "a roughly 75-day delay between her protected activity and an adverse employment action is not, standing alone, a convincing case for proving causation."); *Cooper v. City of North Olmsted*, 795 F. 2d 1265, 1272 (6th Cir. 1986) (rejecting plaintiff's contention that temporal proximity of four months between the protected activity and adverse action was sufficient, on its own, to create an inference of retaliation). Accordingly, Jobe cannot establish a prima facie case for retaliation under Title VII or Ohio law.

18

Jobe also asserts her discipline on September 13, 2019, was in retaliation for her use of FMLA leave ending on August 21, 2019, and making a complaint about the paycheck issue on August 30, 2019. (Doc. No. 24 at 15). Jobe argues the temporal proximity between her use of FMLA (and subsequent complaint about the delay in receiving her paycheck) and the September 13, 2019 discipline is sufficient to establish a prima facie case of retaliation. I agree that at this stage of the *McDonnell Douglas* analysis and considering that only a few weeks elapsed between the incidents, temporal proximity alone may satisfy the causal connection element. *Montell v. Diversified Clinical Servs., Inc.,* 757 F.3d 497, 505 (6th Cir. 2014) ("Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity alone may satisfy the causal prong of a plaintiff's prima facie retaliation case.").

Nevertheless, GM has set forth a legitimate non-discriminatory reason for Jobe's discipline on September 13, 2019 – she was late to work in violation of GM's rules. (Doc. No. 18-1 at 146; *see also* Doc. No. 20-1 at 7). The record shows that Jobe admitted to being late on September 10, 2019, (Doc. No. 18-1 at 21), her supervisor Tucker observed that she was not at her workstation when the shift began, (Doc. No. 20-1 at 7), and that being late is a disciplinable offense. (Doc. No. 22-1 at 85). This is sufficient evidence to shift the burden of production back to Jobe to establish that GM's proffered reason was pretextual. *Ford v. Securitas Sec. Servs. USA, Inc.,* 338 F. App'x 483, 489 (6th Cir. 2009) ("[A]n employer's burden to establish a legitimate nondiscriminatory reason is not onerous, [but] the employer must offer at least some evidence of its rationale.").

Jobe does not set forth any evidence or argument to establish pretext in her brief opposing summary judgment. (*See* Doc. No. 24 at 15); *see also Guarino v. Brookfield Twp. Trs.,* 980 F.2d 399, 406 (6th Cir. 1992) ("[Rule 56] requires the non-moving party to do its own work, and to assist the trial court by responding to the motion, pointing out as specifically as is reasonably possible facts that might demonstrate the existence of genuine issues.").

19

Moreover, and unlike at the prima facie stage, "the law in this circuit is clear that temporal proximity cannot be the sole basis for finding pretext." *Donald v. Sybra, Inc.,* 667 F.3d 757, 763 (6th Cir. 2012).  At best, Jobe suggests that GM's reason was pretextual because others had not been disciplined for the same conduct.  But again, she does not provide any evidence of these allegations other than her own testimony.  *Mitchell*, 964 F.2d at 585 ("Courts have repeatedly held that the plaintiff's denial of the defendant's articulated legitimate reason without producing substantiation for the denial is insufficient . . . to withstand a motion for summary judgment.").  Since Jobe has not identified any evidence from which a jury could reasonably reject GM's explanation of why she was disciplined, *Chen v. Dow Chemical Co.*, 580 F.3d 394, 400 (6th Cir. 2009), she has failed to carry her burden of showing pretext and thus, her claim must fail.

## V. CONCLUSION

For the reasons stated above, I grant GM's motion for summary judgment as to all claims, (Doc. No. 22), and close this case.

So Ordered.

s/ Jeffrey J. Helmick
United States District Judge